Suit by E. G. Brouillette against the Texas New Orleans Railroad Company for damages resulting to plaintiff on account of personal injuries sustained by his minor son, Fred Otis Brouillette, caused by his being run over by a passenger train of defendant at or near its depot in Orange, Texas.
Plaintiff alleged: "That about November 16, 1906, appellant ran one of its passenger trains known as No. 3, or the 'Oriole,' composed of an engine and several passenger coaches, into the city of Orange, and stopped the same near its depot, the engine thereof being at its watering tank, and at which place the passengers alighted from and entered said train. That while said train was in said position it entirely blocked Greene Avenue, a public thoroughfare in the city of Orange, and prevented any travel for the time being thereover, said watering tank being on the opposite side of the street from the depot of defendant hereinbefore mentioned.
"That Fred Otis Brouillette, an infant two years and seven months of age and the son of this plaintiff, was crossing the track of defendant company in the rear of its said train and ten or fifteen feet from the rear thereof, and defendant carelessly and negligently, and without keeping any lookout for persons on its track in the rear of its said train, and without having any persons on the rear of said train for the purpose of keeping a lookout along its track, on said date backed said train upon and over plaintiff's said child and over his left leg, and so injured and mashed same that the same had to be amputated, and was amputated.
"That had defendant kept a reasonable lookout for persons on or near its track it could and would have discovered the peril and position of plaintiff's said child, and would and could have avoided injuring him as aforesaid, but, disregarding its duty, defendant negligently and carelessly at said time and place backed said train over said child, without warning, and without any effort to discover its peril, and without keeping any lookout for persons on its track, and caused him the injury before stated."
Defendant, in addition to other pleas, specially pleaded contributory negligence on the part of plaintiff as well as on the part of the child's mother.
The case was tried before the court without a jury and resulted in a judgment for plaintiff. Defendant appeals. *Page 339 
This is a companion case to Texas New Orleans Railroad Company v. Brouillette, 53 Texas Civ. App. 33[53 Tex. Civ. App. 33] (117 S.W. 1014), which was reversed by this court for an error in the charge. This case was tried upon the evidence introduced in the trial of the case referred to, except on the issue of contributory negligence of the plaintiff and his wife, and the statement of the case made in our opinion in that case is adopted as a substantially correct statement of this as to the facts immediately attending the injury to the child, and is as follows:
"Fred Otis Brouillette, two years and seven months old, lived with his father in the City Hotel, situated on Green Avenue in the city of Orange, a short distance north of appellant's railroad and depot. On November 16, 1906, about noon, appellant's passenger train, headed west, came into Orange and stopped at the usual place, the engine being at a water tank just west of the depot where it took water. This occupied some four or five minutes. Usually while taking water the passengers alighted and embarked, and baggage was discharged and loaded; but sometimes, when there was a large amount of baggage to be loaded, the train, after taking water, would be backed until the baggage car would be opposite the baggage-room, and the baggage would be loaded from that point. On the occasion in question the large amount of baggage to be loaded required that the train be backed, and in backing it the appellee was run over and injured.
"When the train came into Orange, E. G. Brouillette, father of Fred Otis, was in the City Hotel, and immediately upon the arrival of the train started to the depot, which is situated south of the railway track, leaving Fred Otis with an older brother inside the hotel sitting at the table. The train having stopped across and blocked Green Avenue, and the cars of the train being vestibuled so that he could not pass between them, Brouillette gained the depot by walking eastwardly by the side of the standing train and crossing the track at the end of the rear car. The first seen of Fred Otis, after his father left him in the hotel, was just as the train started to back, and he was then falling upon the track, having been struck and knocked down by the rear end of the rear car of the train. He was then between the rails, but nearest the north rail. The physical facts, as well as the testimony of all the witnesses, tend to prove that the child, at the very moment the train began to back, was standing on the track immediately behind the last car. The presumptions arising from the facts are that the child attempted to follow his father to the depot, taking the same route, and had just reached and gotten upon the track as the train began to back. He was not seen by any witness or by any of the trainmen when he left the hotel, nor while approaching the place where he was hurt.
"The evidence further shows that the greater portion of the city of Orange and appellant's depot were south of the track; that passengers got on and off the train on that side; that all persons having business there when the trains came in transacted it on that side, and that, the train being entirely vestibuled, only the doors on the south side were opened, while those on the north always remained closed, and that the duties of the train operatives directed their attention and activities to the south side, except that of the engineer, who, while his *Page 340 
station was on the right or north side of the engine, on this occasion occupied most of his time while the engine was taking water in oiling his engine. None of the train crew except the conductor knew until the train was ready to start that it would have to be backed for baggage. The conductor motioned to the brakeman to go back and guard the rear of the train and see that the track was clear, and the great weight of the evidence conclusively shows, we think, that the brakeman, in obedience to the signal of the conductor, went to the rear of the train, looked to see if the track was clear, and, seeing no one upon it, swung himself on the platform steps and gave the conductor the signal to back, which was repeated to the engineer, who, after looking back down the train to see if the track was clear on his side, and it appearing that it was, immediately put the train in motion. At the time the brakeman looked at the track we think it clear from the evidence that the child was standing on the track so close to the car as not to be discovered by a person of ordinary care standing at or upon the steps of the car platform where the brakeman stood, but to have seen him it would have been necessary for the brakeman to go behind the car to look to see if any one might be there, or to stoop and look under the car."
The facts introduced upon the issue of contributory negligence will be referred to further on in this opinion.
Appellant's first assignment of error complains, in substance, that the court erred in rendering judgment for plaintiff, because plaintiff had wholly failed to show by any legally sufficient evidence that defendant had been negligent in any of the matters alleged in the petition, but, on the contrary, that the evidence conclusively shows that the child approached defendant's train while same was standing still at the station at Orange, without his approach and position of danger being known to or discovered by any of defendant's trainmen, and under such circumstances that defendant and its trainmen could not properly be held to be negligent in failing to discover the child's approach or in failing to discover its position of danger, and that from the undisputed evidence and the physical facts, taken as a whole, the injury to the child does not appear to have resulted from any negligent act of defendant, or from any omission of duty on its part in any of the particulars alleged in plaintiff's petition.
Under this assignment appellant presents the following proposition: "The uncontroverted evidence shows that, at the time Fred Otis Brouillette was injured, appellant's train had just started in backward motion; the child, at the time the train started backward, being immediately at the rear of the train and upon the north rail of the track, having approached and gotten into such dangerous position while the train had been standing still, and under such circumstances that defendant can not be held to have been guilty of negligence in failing to discover its approach and his position of danger, and the evidence wholly fails to show any negligence upon the part of the railroad company in operating its train at time of the injury to said child. On the contrary, the evidence conclusively shows that the railroad company was exercising at least ordinary care in the operation *Page 341 
of its trains at the time of the injury to Fred Otis Brouillette."
We think the assignment can not be sustained. Granting that the brakeman went to the rear of the train before it began to back for the purpose of seeing that no one was on the track close enough to be injured by the moving of the cars in that direction, we have the testimony of the witness Wynne, who swore that just a short time before the train began to back he saw a child, which he afterwards ascertained was Brouillette's, and that it was then on the track about fifteen feet from the rear car; that "when I first saw him he was on the track and looked like, to me, got down to crawl over it. The child was two or three years old and very small, and he started to go back over to the platform towards the depot when the train commenced backing up. I did not see the child when he was actually run over." It was shown that the train stopped at such a place as to completely block Green Avenue, which was the only crossing near the station, and the only recourse left to those who desired to pass along the street while the train was there was to cross the railroad track either in front or to the rear of the train. The street was frequently traveled, and defendant might have anticipated that persons traveling it at such a time would cross the track at one or the other place. Hence, when it was determined to start the train in a contrary direction to that in which it was headed, it was incumbent upon the operatives to use ordinary care to see that some one was not so situated as to be injured by such a movement; and if the testimony of the witness Wynne is true the court would have been authorized to find that the exercise of such care by defendant's employes would have enabled them to discover the presence and danger of the child in time to have avoided the injury to him. It may be that the testimony of Wynne and the other evidence relied upon by appellee to sustain the judgment is opposed by the great weight and preponderance of the testimony, but that is not the assignment of error before us, and, indeed, no such assignment is presented. We do not think that there is an entire absence of evidence in the record to prove actionable negligence on the part of defendant, and the assignment must therefore be overruled.
Appellant's second assignment of error is as follows: "The court erred in rendering judgment for the plaintiff herein, and in not rendering judgment for the defendant, because, as one defense, defendant pleaded specially contributory negligence on the part of plaintiff in failing to protect his child, or to take any precaution to keep him from wandering unattended into a position of danger where he was injured, although plaintiff knew, or should have known from the facts within his knowledge, that without such care or protection his minor son would probably attempt to follow him to the depot and wander into a position of danger about defendant's train; and specially pleaded such facts and circumstances as made it a duty incumbent upon the plaintiff to have exercised such affirmative care or precautions to prevent said child from wandering into the position of danger where he was injured, which, under the facts and circumstances then known to the plaintiff he knew, or reasonably should have known, that *Page 342 
it would probably do, and such negligence of the plaintiff is reasonably shown by the evidence in this case, taken as a whole, and conclusively shown by the testimony of plaintiff himself as contained in the record; and it is further conclusively shown by the testimony of plaintiff himself that he exercised no care and took no precautions to prevent his said child from wandering unprotected into a position of danger where he was injured, although the facts and circumstances known to the plaintiff were such as required of him, in the exercise of ordinary care, that he take suitable precaution and exercise such care and protection to prevent what the facts and circumstances then known to him reasonably indicated would probably occur and which did occur, that his said minor child would attempt to follow plaintiff, his father, over to defendant's depot and into a dangerous position where he was likely to be injured by defendant's train."
A short time after the child was hurt the plaintiff made to the defendant a statement in writing, which was introduced in evidence. Such parts of the statement as are pertinent to the question under consideration are as follows:
"On November 16, 1906, about noon, I left the City Hotel at Orange, which is run by me, and went over to the T. N. O. passenger depot which is just across the track and south of the hotel. The passenger train No. 3, coming from the East, had just arrived at depot and was standing at depot, the engine at water tank taking water; when I left the hotel I walked out to track on which train was standing, about thirty or thirty-five steps from hotel, and then walked to the east end of train along the north side of it to the rear, and crossed over track opposite the express office, then on down platform, stopping in front of the depot office window; I had only been there a minute or so when the train began to move back slowly, moving east; can't say just what speed train moved back, about one coach length. I can't say whether train had come to a stop or not when I was informed by Robert McGehee that my little two-and-a-half-year-old baby boy had been run over by the train.
"When I left the house to go over to the depot I left my little boy in the dining room, eating dinner, and had no thought of his being out of the house, and the only way that I can account for his being out of the house and upon the railroad track was that he got down from the table and tried or started to follow me. I did not say anything to him or any one else when I started over to depot, and thought that I had run away from him, and that he would not know where I was, and would not try to follow me.
"It is only about thirty steps from the hotel door to the railroad track, the hotel being on the north side of track and depot on south side of track. There is no fence around hotel, and there was nothing to prevent him from coming out of hotel and over to track.
"The child was born where I now live, and was perfectly used to the trains, and had been warned about going upon the tracks; was afraid of the trains when they were moving. He would sometimes go out on the tracks and over to the depot, but that was when there were no trains on the track. *Page 343 
"There is only one track at the depot, and that is the main line, and a great many trains pass by going each way, both day and night.
"It was no one's special duty to mind the baby — all felt it was a part of their work; and this being the noon hour, all were busy in the kitchen and dining room.
"If any of the family or any one else saw him leave the hotel, I have not heard of it, and I am sure they did not."
The plaintiff testified on the trial as follows: "The baby was eating his dinner with his little brother in the kitchen when I left the hotel to go over to the depot to see about the trunk. I was not at the table at all; the baby was eating his dinner in the kitchen. I and the baby were both in the kitchen when the train came in, and the baby stayed there, and I left him there when I left. I didn't think that the baby saw me when I left to go over to the depot. I am sure that the baby did not come out ahead of me. Freddie must have followed over close after me.
"Freddie often would go with me; I would often take him around with me, and I would often take him over to the depot with me, too. He was in the habit of following me around when I wasn't going very far. He would follow me anywhere if I would let him do it; he has always been that way ever since he was able to walk; he would follow me anywhere I was going.
"When I left Freddie in the kitchen there and went off, I didn't say anything to him about where I was going. I didn't say anything to any one about where I was going. I think that Freddie's mother was in there when I left; I don't remember for sure. I did not say anything to her about where I was going, nor I didn't say anything to any one else about watching the child after I was gone.
"I went over to the depot several times a day to meet the trains; the trains came in there frequently, and I went over there to meet them, and often Freddie would follow me over there, or I would take him along. I have taken him over there with me a number of times.
"Freddie may have seen me go over there to the depot; I don't know whether he did or not; I didn't think that he saw me when I left. He knew that I was in the habit of going over there to meet the trains. Freddie generally followed me — never noticed him following any one else.
"The child, at the time I left him to go over to the train, was in the house — the room right back in the house; he was in one of the rear rooms of the house. To come out of the house from where he was you would have to come out through the dining room and office, and come out that way. The doors were not closed at that time; I think that the doors were open. I think Freddie's little brother was in the kitchen at the same time, and I think my wife was there; I don't think we ever talked about it, as to whether she was there or not, but I think that she was there in the kitchen. They had been eating dinner just a short time; the children had just come from school; Freddie didn't go to school; his little brother did, and I think that Freddie was eating dinner with him.
"We went and got the child several times when the trains would be passing; that was no unusual thing to go out and get him or see *Page 344 
where he was. We did not let him generally play and not pay any attention to him; we never did let him play there by himself — that is, if we saw him. I don't know how often I did go and get him and take him back when he was over there by the depot; I don't reckon I did it as much as a dozen times; he might have been there several times. I think that I have gone myself and got him; I have never seen any one else do it; I heard some of them say that they did; they said they got him from off the tracks and brought him into the house. I don't remember whether I know of more than one person that got him off of the track and brought him back in the house, or not; I can not remember about that. That was some time before it happened. The child was out there by himself when I went and got him. It was not one of the family that I heard brought him from the tracks; it was some one else other than the family.
"The way the City Hotel is located the child could come out through the office and through the front door and out on the gallery — there wasn't any fence — and walk right out to the public road or across to the depot, or to where the child was hurt, without opening any doors or anything of that kind. There is a street on two sides of the house, and the hotel is about northwest of the depot. The child could walk around like any one else."
Mrs. Brouillette, the mother of the child, testified as follows: "I remember the day of the accident. I last saw Freddie in the kitchen, right by my side, eating dinner; he was there at the time his father left the room. I did not see Freddie leave there at all. I was right there in the kitchen; it was twelve o'clock, and I was fixing dinner to put on the table. We keep boarders, and it was time for the boarders to come in and eat dinner. I didn't have any other help except myself and my daughter. I don't think that we had any more boarders than six at that time. We had some transients once in a while, not very often.
"The kitchen is the last room in the north end. To get from where Freddie was to the front door you would have to go through the dining room and office, and go through the hall, too; there are two ways. I am sure it wasn't over four or five minutes after Mr. Brouillette left before Freddie must have left. He, Freddie, was sitting down on the floor eating dinner with his little brother at the time his father left.
"At the time Freddie was hurt his little brother had just finished eating dinner and was ready to go back to school. His little brother was eight years old. It seems to me that I had seen Freddie a few minutes before his little brother left for school. I am under the impression that Freddie went out after his little brother left for school.
"I had no idea that the child had left the room when he got hurt; I saw him a minute or two before, and he was quiet and content at that time; he was always in the kitchen at that time, right by me — just happened to slip off that day. I did not know he had slipped off until he was brought in. I did not know anything about his undertaking to go to the depot and exposing himself to danger.
"The last time I saw the baby he was in the kitchen, eating his dinner. I couldn't tell you just how long it was before then and *Page 345 
when my husband brought him in in his arms, but I would guess about ten minutes. I don't know when my husband left. I couldn't tell you whether my husband was there the last time I noticed Freddie in the kitchen before he was hurt, or not; I didn't even know my husband was gone. I am sure that I saw Freddie in the kitchen eating his dinner four or five minutes before my husband came back.
"Of course, I did not have my eye on the child all of the time, ordinarily. He played around pretty much as he pleased on the front porch and in the side yard. We have got a small yard there on the north side of the house, with a fence around it — not on the back of the house, but on the side; not the side next the street, but the other side. The road runs on two sides of the house, or the street does; the street runs on the south side and the west side, but there is no street on the north side, and that is where the yard is. When you come out the front door there is the railroad in front, and there is a street on the other side and in the back, and there is no fence around those sides, and the children could play around as they saw fit, ordinarily.
"Mr. Brouillette, immediately before he went over to the depot, was sitting down on the front porch. At the time he left, or about that time, he was sitting on the front porch. He did not come in the kitchen and tell me where he was going, nor I had not seen him in the kitchen; if he came in there I didn't see him. The last time I saw him he was on the front porch, and the last time I saw Freddie he was in the kitchen eating his dinner."
From this testimony we can not say that plaintiff was guilty of contributory negligence as a matter of law in respect to the matter complained of in the assignment. Houston City Street Ry. Co. v. Dillon, 3 Civ. App., 303.
No reversible errors are pointed out by the assignments. The judgment of the court below is affirmed.
Affirmed.
Writ of error refused.